### In the matter of ISAAC NEGUS, and absconding debtor.

Where the *demand* of a creditor who sues out an *attachment* against an *absconding debtor* is unliquidated, it is competent to the *trustees* to assess and determine the damages of the creditor in like manner as a jury would do in an action of covenant.

The decisions of *trustees* under the *absconding debtor act*, in determining the amounts due to the several creditors, will be reviewed by the supreme court; if the trustees err in the application of a principle of law, the court will correct the error, but if they err on a question of fact or opinion, as in the assessment of *unliquidated damages*, their decision will not be set aside, unless clearly against the weight of evidence.

Where, in the assessment of damages for the breach of a covenant, the trustees allowed a sum to a larger amount than would have been allowed by the court, yet as the court could not say that the damages were extravagant, they refused to set aside the decision of the trustees.

Where a bond is given intended as a *bond of indemnity*, but containing a *covenant* that the obligor will pay certain debts, for the payment of which the obligee is liable, and the obligor fails to perform, an action lies for the breach, and the obligee is entitled to recover the sums agreed to be paid, although it is not shewn that he has been damnified, unless from the whole instrument it manifestly appears that its *sole object* was a covenant of indemnity.

DISTRIBUTION of estate of absconding debtor. *P. S. Sinnott* sued out an attachment against *I. Negus* as an absconding debtor.   The *trustees* appointed in the case, in adjusting the accounts and demands against the estate of the debtor, allowed to the attaching creditor the sum of $1876,79, as due to him for debts for which he was responsible, and which Negus had bound himself to pay, and also allowed to him $1000 as *damages* sustained by reason of the non-performance of certain covenants entered into by Negus with the attaching creditor.   The *commissioner* who issued the attachment having made a *report* to this court, in conformity to the provisions of the statute, 2 R. S. 13, § 68, and the court having thus obtained jurisdiction over the proceedings, application is now made in behalf of the debtor to set aside the decision of the trustees in determining the amount due to the attaching creditor.   The demand of *Sinnott* against *Negus* originated as follows: In July, 1827, one W. L. Pierce entered into a contract with the commissioners for draining the Cayuga marsh-

es, by which he bound himself to make a certain drain or ditch: in which contract *Sinnott* was a partner with Pierce, although not named in the contract. In *December* of the same year a new contract was entered into by Pierce with the commissioners, in which both *Sinnott* and *Negus* were partners with Pierce, although not named in the contract; the contract was in writing, in which was specified the work to be done, and the compensation to be received therefor, viz. $24,000 to be paid as the work progressed, upon the estimate of an engineer; Pierce pledging teams, implements and other property used in doing the work in security for the fulfilment of the contract, and in case of failure to perform, authorizing the commissioners to take the property, sell, or use it, and to let out the job to such person as they should think proper. Pierce carried on the work until April, 1828, when he left the country, having appointed *Negus* his agent to complete the job. In the same month, *Negus* entered into a bond with sureties to the commissioners, reciting the contract of Pierce, and his own appointment as Pierce's agent, and binding himself to apply such monies as should be paid to him, and such property as should be put into his hands by the commissioners for completing the drain, until the work should be finished and accepted by them. Negus proceeded with the work in the name of Pierce, but *on the partnership account* until the 16th May, 1828, when he purchased Sinnott's interest in the job, and paid him $500 for the same; taking the job to himself, subject to the conditions of the contract with Pierce, and assuming the payment of all debts which had then been contracted, and which should thereafter be contracted in the further prosecution of the work, and entering into a bond to Sinnott for the performance of his agreement. The bond to Sinnott refers to Pierce's contract, and recites that certain debts had been contracted to carry on the work, specifies a number of them, and refers generally to all debts which had been contracted for prosecuting and finishing the job, for the payment of which Sinnott was liable in law or equity. Then follows the condition, which is: that *Negus* shall apply all the money then on hand and thereafter to be received, and all the property for the completion of the

job; and after its completion, that the residue of the money and property shall be applied to the payment " of the debts aforesaid, and of all costs and damages to which Sinnott may be liable on account of those debts ;" and further, if Negus shall neglect or refuse to comply with those stipulations, then he shall put Sinnott in possession of the drain, and Sinnott is to be at liberty to re-enter and take possession of the same. After the agreement thus made, Negus carried on the work until August, 1828, when he absconded; after which the commissioners took possession of the property used in the construction of the work, and employed one Buck, who, under their direction, completed the job.

Sinnott, the attaching creditor, proved that the debts contracted to carry on the work, for the payment of which he was liable, amounted to $1876,79. He also exhibited an account amounting to upwards of $1200, consisting principally of charges for services and expenses in conducting this proceeding; whether all or any part of this account was proved does not distinctly appear; the trustees allowed him $1000 as *damages* sustained by him by reason of Negus' absconding without completing or surrendering the drain.

*A. Taber*, for the debtor.

*N. P. Randall*, for the attaching creditor.

The motion was heard by the *Chief Justice*, who delivered a full opinion upon the *facts*, as well as the *law* of the case; from which opinion the following extracts are made :

The principal question in this case is, what *demand*, if any, has Sinnott against the estate of the absconding debtor? He is the *attaching creditor*, and to entitle him to institute these proceeding, he must be a creditor of Negus to the amount of $100 or upwards, and his demand must arise upon *contract, judgment or decree.* If he has a *demand arising upon contract* it is no objection that it is *unliquidated*, the statute giving the remedy as well where the demand is unliquidated as where it is liquidated. 2 R. S. 3, § 3. For the purpose of liquidating it, the proceedings in this case may be assimilated to an action

ALBANY,
Feb. 1832.

In the matter
v.
of Negus.

ALBANY,
Feb. 1832.

In the matter
v.
of Negus.

of *covenant*, in which Sinnott is plaintiff, Negus the defendant and the *trustees* the tribunal to determine the rights of the parties.

The first object urged against the decision of the trustees is, that the bond executed by Negus to Sinnott is simply a *bond of indemnity*, and that therefore Sinnott must shew that he has been damnified by payment of the debts which Negus assumed to pay, or that he has been damnified in some other way. From the whole transaction taken together, it is plain that the bond was intended as a bond of indemnity. Had Negus completed the job, and paid the debts which Sinnott was liable to pay, Sinnott would have had no further claims upon him or the job: the object of taking the bond was therefore to indemnify Sinnott; but it does not therefore follow that no action lies until actual damages has accrued. Whether an action lies or not, depends upon the true intent and meaning of the covenant; if it is simply to indemnify, and nothing more, then damages must be shewn, before the plaintiff can recover; but if there is an affirmative covenant to do a certain act, or pay certain sums of money, then it is no defence in such an action to say that the plaintiff has not been damnified. In such case it is the duty of the defendant to perform his own contract; if he does not, an action lies for the breach, and the measure of damage is the amount of the sums agreed to be paid, or the injury sustained by the plaintiff, arising either form liability incurred, or advantages which would have accrued from the performance of the acts which the defendant had covenanted to perform. If a bond, in which the obligor covenants affirmatively to pay certain sums, conclude with a covenant to indemnify and save harmless the obligee, it does not therefore become a mere covenant of indemnity, unless such appears from the whole instrument to have been its only object. The case of *Douglas* v. *Clark*, 14 Johns. R. 177, recognizes the rule as above stated. There the plaintiff had entered into a bond with one Rice, conditioned to pay to the colector certain duties, and the defendant gave him his bond, conditioned to pay off and discharge the plaintiff's bond, and hold him harmless, &c. Under the circumstances of the case, the court considered *that* a mere bond of indemnity, and prin-

cipally for the reason that the defendant was not the person
whose business it was in the first place to pay those duties.
Upon the ground there assumed, it would be difficult, I appre-
hend, to sustain the point, that this bond is a mere bond of in-
demnity.    Here Negus assumes the debts of the partnership
—he makes them his own individual debts—he is the person
to pay, as was Rice, in the case of *Douglas* v. *Clark.*   He is
not a mere surety as Clark was, covenanting for the punctu-
ality of another person.   The case of *Post* v. *Jackson*, 17 Johns.
R. 239 and 479, in Error, is much more like this case.   The
plaintiff was lessee of certain premises, and had covenanted to
pay the rent; he assigned to the defendant, who covenanted
with the plaintiff that he, the defendant, would perform the
plaintiff's covenants in the original lease to him.   The plaintiff
alleged that the defendant had not paid the rent, and several
pleas were pleaded, two of which were demurred to.   Upon the
argument, exception was taken to the declaration, because it
did not aver that the plaintiff had been damnified by the breach
of the defendant's covenant, by payment of the rent, either
voluntary or compulsorily; but the court held such an aver-
ment unnecessary.   The covenant was to pay the rent when
due, and the moment when the day of payment passed, and
the rent remained unpaid, the covenant was broken.   So in
this case, the covenants were to complete the drain and pay
the debts, and the moment the work was abandoned, and the
debts left unpaid, both covenants were broken.   Another
question arises, says Van Ness, justice, in *Post* v. *Jackson,*
"what shall be recovered? nominal damages only, or the
amount of the rent due? My opinion is that the latter is re-
coverable.   The covenant is not that the defendant shall in-
demnify the plaintiff against his own covenant in the lease,
or against any damage which he may sustain, but it is express
and positive."   The same is true of the covenant of Negus;
it is express and positive, that he will pay the debts, that is,
such is its evident import and meaning; and though a cove-
nant to indemnify follows, that does not alter the force and
effect of the preceding covenant.   The true question is, what
was the intention of the parties? was it that Sinnott should
pay these debts himself, and then Negus reimburse him? there

is no color for such a construction; Negus either had or was to have the means in his hands to pay the debts, to wit, the money received from the commissioners. Sinnott had withdrawn from the concern; Negus took it for better or for worse; he was to perform all the duties which were obligatory upon the firm. The distinction taken by Chancellor Kent, in *Jackson* v. *Post, in Error*, 17 Johns. R. 482, is this: "Where a defendant has undertaken to do an act in discharge of the plaintiff from such a bond or covenant, he must shew, specially, matter of performance; and this Jackson ought to have shewn in this case; but where the defendant has undertaken to acquit and discharge the plaintiff from any damages, by reason of his bond or covenant, he then merely undertakes to indemnify and save harmless, and the plaintiff is then bound to shew his damages." It must be observed that the learned judge speaks of bonds drawn in those different modes, but here the bond contains both modes of expression; the ultimate object of both is indemnification to the plaintiff. Where indemnity alone is expressed, it has always been held that damage must be sustained before a recovery can be had; but where there is a positive agreement to do the act which is to prevent damage to the plaintiff, then an action lies, if the defendant neglects or refuses to do such act; and where the covenant is both to do the act and to indemnify, we must resort to the intention of the parties. Whatever may be said of the case of *Douglas* v. *Clark*, it is sufficient that this is distinguishable; and it is difficult for me to conceive of a case where one assumes to do what was before the duty of another, where it is not the intention of the parties that the party contracting to perform shall perform in the first instance according to his agreement. I presume to say that it never was the intention of the parties in such a case, that the party to be indemnified is first to be damnified. It results, from this view of the case, that Sinnott is entitled to recover, and that his damages are to be not merely nominal, but such as he has sustained, or is liable for.

Negus' liability is twofold: 1. To pay the debts; 2. To finish the drain. 1. As to the payment of the debts: The liability assumed by the defendant Negus is co-extensive with the liability of Sinnott; and as Sinnott was liable to pay all the debts con-

tracted in relation to the job, so Negus, by virtue of his contract, became liable to pay all the debts; and as interest is an incident to a liquidated demand, so Negus became liable to pay interest whenever Sinnott would have been liable to pay it. I conclude, therefore, that the whole amount of debts should be assessed as part of the damages which Negus should pay to Sinnott on the bond. Those debts, from the papers before the court on a former motion, were shewn to be $2107,53; but the trustees have, by their last decision, admitted part of those debts as debts due by Negus alone, to wit: Murphy, $19,55; Roosevelt, $105,17; Avery, $12,93; Dunham, $59,49; and Hale & M'Clure, $33,60, in all $230,74. This sum, therefore, should be deducted from the total amount of indebtedness for which Sinnott is liable, and it will leave $1876,79; which sum exceeds the amount admitted to be in the hands of Negus; but that, I apprehend, makes no difference. I have considered the bond as a covenant to pay all the debts. That Negus had no more in his hands with which to pay the debts, is his own fault; by abandoning the job he lost the means of obtaining money to pay them, which surely should not prejudice Sinnott, who remains liable for the whole amount of the debts, and, as I am to presume, will be compelled to pay them.

As to other damages, from the breach of the covenants to complete the drain, and to surrender possession, &c. all that Sinnott could ask, was to be relieved from responsibility as to the payment of the debts for which he was liable, unless he had been called upon to fulfil Pierce's contract to complete the drain. The commissioners chose to adopt another course; they took possession themselves, and finished the job. They acted prudently; they took a mortgage of all the personal property on the job, by way of security, and they were not bound to pay faster than the work was done. When Pierce absconded, they took a bond from Negus, with sureties for his faithful performance; that bond has been cancelled and given up, his responsibility, therefore, to the commissioners, is discharged; the commissioners make no claim upon any one; I conclude, therefore, that Sinnott is not liable to them in any sum whatever, on account of Pierce's contract. Had Negus,

therefore, paid the debts, Sinnott would have had no claim upon him. This view of the case excludes all speculation as to what profits Sinnott could have made out of the job. He had already received $500 as his share of those profits; besides, it does not appear that he ever applied to the commissioners to complete the job. His bond against Negus provided that Negus should surrender up the drain, and Sinnott was thereby authorised to re-enter. He never attempted to do so. Negus did not prevent him, though he neglected to surrender it; nor does it appear that the commissioners prevented him, though they had a right to do so. It is immaterial to him, whether the work was completed with economy or not. It seems to me, therefore, that all Sinnott could recover in a court of law on this bond, is the amount of the debts unpaid and such damages and expenses as he had been put to by reason of Negus' default.

Sinnott presented an account amounting to more than $1200; whether all, or any part of it was proved, does not expressly appear; it is composed principally of services and expenses in conducting the prosecution. The trustees have allowed to Sinnott as damages, $1000, which he has sustained by reason of Negus' absconding without completing or surrendering the drain. The authority given to this court is general; the trustees are subject to our order, upon the application of any creditor, or of the debtor, in relation to the execution of the powers and duties confided to them. If they err in the application of any principle of law, it is the duty of the court to correct the error; but if they err on a question of fact or opinion, as in the assessment of unliquidated damages, the court should not interfere with their decision upon any different principle than is applied to the verdict of a jury, or the report of referees, neither of which will be set aside, unless clearly against the weight of evidence. It appeared, before the trustees, that the defendant's covenant had been broken, and that the plaintiff had been put to great trouble and expense in consequence thereof; and though I should not have been inclined to give damages to so great an amount as is allowed by the trustees, I am not prepared to say that

they are extravagant; particularly, as the statute is silent as to the allowance of the expenses of the prosecution.

My conclusion, on the whole case, therefore, is, that the absconding debtor has no ground of complaint against the decision of the trustees, either as to the debts for which his estate is held responsible, or as to the general damages assessed for his breach of covenant, in not completing the drain.

I am of opinion that the motion to set aside the decision of the trustees be denied, but without costs.